J-A12011-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| REGGIE WILLIAMS, | |
| Appellant | No. 2443 EDA 2014 |

Appeal from the Judgment of Sentence Entered December 6, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000754-2009

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED AUGUST 30, 2016**

Appellant, Reggie Williams, appeals from the judgment of sentence of 20 to 40 years' incarceration, imposed after he was convicted of third-degree murder.  Appellant raises various issues for our review, including challenges to the sufficiency and weight of the evidence, evidentiary rulings by the trial court, and the discretionary aspects of his sentence.  Appellant also presents an after-discovered evidence claim, asking us to either grant him a new trial or remand for an evidentiary hearing.  After careful review, we vacate Appellant's judgment of sentence and remand for further proceedings consistent with this memorandum.

_____

[*] Former Justice specially assigned to the Superior Court.

Appellant was initially tried before a jury in February of 2011, but a mistrial was declared when the jury was unable to reach a verdict. Appellant was retried in July of 2013. The trial court summarized the facts established by the evidence presented at the second jury trial, as follows:

On March 29, 2008, sometime before 3:20 a.m., James Anderson and his friend Harvey Tilghman went to Club 121, an after-hours nightclub at 35th and Wharton Streets in South Philadelphia. When Mr. Anderson arrived at the nightclub he was met by Jana Perry, a female friend whom he had invited earlier. A short time after Ms. Perry entered the nightclub, she joined a line dance on the second floor of the establishment. While Ms. Perry was dancing, Mr. Tilghman and Mr. Anderson stood on the left side of the dance floor and watched the dancers. [Appellant] and Bruce Lee were standing to the right of Mr. Tilghman and Mr. Anderson. They were also watching the line dancers. Mr. Tilghman spoke to the two men and introduced them to Mr. Anderson. While Ms. Perry was dancing, Bruce Lee tugged at her about three times. Toward the end of the dance, Bruce Lee reached his hand out to Ms. Perry. Mr. Anderson also reached his hand out to her. Ms. Perry chose Mr. Anderson.

Mr. Anderson was then knocked to the floor and rendered unconscious, lying flat on his back. His face was swollen and he was barely breathing. Mr. Tilghman kneeled to the floor and attempted to aid his friend. As Mr. Tilghman attended to Mr. Anderson, [Appellant] and Bruce Lee proceeded to stomp on Mr. Anderson's face at least twice. [Appellant] was 6'2" tall and weighed 215 pounds. Bruce Lee was 6'5" tall and weighed 260 pounds. Both men were wearing Timberland boots. During the assault on decedent, Mr. Tilghman and [Appellant] engaged in a shoving match with each other. [Appellant] pushed Mr. Tilghman, causing him to fall over Mr. Anderson who was still lying on the floor. Mr. Tilghman rose and said: "I told you that was my friend, what did you do?" [Appellant] yelled back: "He disrespected me." Within seconds, security responded and separated the two men. The nightclub patrons scattered and some left the establishment. [Appellant] fled the scene. Minutes later, police arrived on the scene.

James Anderson was pronounced dead at the Hospital of the University of Pennsylvania on March 29, 2008 at about 4:10 a.m. At trial, Dr. Gary Collins, deputy chief medical examiner, testified as the Commonwealth's forensic pathology expert. After conducting an autopsy of Mr. Anderson, Dr. Collins concluded to a reasonable degree of medical certainty that the cause of death was [a] blunt impact facial injury. Mr. Anderson sustained a palpable fracture of his maxillary, right cheek bone, and nasal bone. His right cheek, right lower and upper eyelids, and right upper lip were bruised and swollen significantly. Dr. Collins further observed a three-point pattern on [Mr. Anderson's] right cheek. Mr. Anderson also sustained injury to his lower lip, where there were two lacerations: one across his lower lip and one that separated his lower lip from the gum line. Dr. Collins further observed blood stains inside Mr. Anderson's oral and nasal cavities and lungs. There were no other blunt or sharp injuries or wounds to the remainder of his body.

Mr. Anderson bled profusely from his facial injuries. As a result, he suffocated from blood that obstructed his airways. Dr. Collins explained that an individual who is bleeding significantly from the nose and mouth will suffocate if he is unable to clear the accumulating blood from those cavities. The individual will then suffer from a lack of oxygen to the lungs or the brain. In addition to determining the cause of death, Dr. Collins concluded to a reasonable degree of medical certainty that the manner of death was homicide. The blunt impact facial injury and the lack of injury to the remainder of the body was consistent with testimony that Mr. Anderson's face was moderately to significantly impacted at least twice by a hard blunt object.

On March 29, 2008, at 3:20 a.m., Sergeant Michael Davis responded to Club 121 after receiving a radio call about a fight. Within seconds other officers including Police Officers Donofrio and Corrado arrived on the scene and proceeded to the second floor of the nightclub with Sergeant Davis. When they reached the dance floor, Mr. Anderson was still lying on the floor. His face was swollen and covered in blood and he was blowing bubbles of blood from his nose and mouth. Sergeant Davis requested expedited rescue and moved the crowd surrounding Mr. Anderson while Officer Corrado administered CPR. Sergeant Davis also asked responding officers to control the crowd and to return as many patrons as possible to the nightclub. About 30 to 40 people remained inside the first floor of the nightclub.

Unfortunately, Mr. Anderson stopped breathing while rescue was on location.

At about 5:45 a.m., Crime Scene Officer William Trenwith responded and conducted a walkthrough of the crime scene. He collected a swab from the large pool of blood found on the banquet room dance floor, one black baseball cap…, and one pair of eyeglasses found on a nearby table. Officer Trenwith submitted this evidence to the criminalistics laboratory. Officer Trenwith also retrieved cups, glasses, and beer bottles and lifted thirteen (13) fingerprints from these items. He submitted the fingerprints to the Latent Fingerprint Unit.

Mr. Tilghman provided three statements regarding this incident to police. On March 29, 2008, at 3:20 a.m., he gave his first statement to Detective Kevin Conaway on the second floor of the nightclub. He did not identify either perpetrator during this interview. In his two-page statement, Mr. Tilghman stated that he did not see anything because his back was turned during the incident. Mr. Tilghman stated that after hearing the commotion, he turned and saw a man lying on the floor with plywood on his face. He further stated that he first recognized his friend by the camouflage vest Mr. Anderson was wearing. After Mr. Anderson was pronounced dead, Detective Conaway transported Mr. Tilghman to the Homicide Unit where he provided a second statement to Detectives Morton and Holmes. In this statement, given on March 29, 2008, at 5:25 a.m., Mr. Tilghman gave an account of the incident and identified a photograph of the decedent. He did not identify the perpetrators, but stated that he saw a brown boot stomping on Mr. Anderson.

After returning home, Mr. Tilghman could not sleep and continued to think of his deceased friend. On March 31, 2008, at 8:55 a.m., Mr. Tilghman went to the Homicide Unit on his own accord and provided a third statement to detectives. In his third statement, Mr. Tilghman identified [Appellant] as "one of the ones" that he saw stomping on James Anderson. Mr. Tilghman identified [Appellant] from a photograph and told police that he has known him for at least ten years. After identifying [Appellant], Mr. Tilghman was shown a separate photographic array. He identified Bruce Lee from the photographic array and stated that Bruce Lee was with [Appellant] at the nightclub. He described [Appellant] as about 6'2" or 6'3" tall and Bruce Lee as about 6'3" tall. Mr. Tilghman told police that he only saw [Appellant] stomping on Mr. Anderson, but he believed that

- 4 -

more than one person stomped his friend. He also told police that he saw [Appellant] stomp Mr. Anderson in the face at least once, but that it could have been more than once. However, at trial, Mr. Tilghman stated that he saw the victim being stomped on at least twice.

At trial, Mr. Tilghman explained his initial failure to identify [Appellant]. He stated that he felt pressured and was afraid of the neighbors' response to his cooperation with police. During his initial interview by Detective Conaway, some of the people inside the nightclub were from his neighborhood. [Appellant] also lived in the neighborhood, about one block away from Mr. Tilghman. At trial, Mr. Tilghman stated that he was "petrified" for his family and for himself.  He stated, "If you tell, basically, everybody going to be against you and you can get killed that way, easy." Detective Conaway testified that Mr. Tilghman appeared worried and upset during the first interview. About one month after providing his third statement to police, Mr. Tilghman moved out of state. He has not returned to Philadelphia except to testify in this case on two separate occasions.

On March 29, 2008, at about 6:50 a.m., Detective George Fetters interviewed Jana Perry. During the interview, Ms. Perry provided a description of one perpetrator. She was also shown a photographic array and asked if she recognized anyone from the incident. Ms. Perry identified Bruce Lee and stated: "Yes, this one. He's the one that was trying to talk with me and he's the one that stomped Jimmy then he rolled out. I didn't see him again after that." At trial, Ms. Perry did not recall providing a description to police. She also claimed to have used the "eeny meeny miny moe" method when she identified Bruce Lee from the photographic array. However, Detective Fetters testified that Ms. Perry did not hesitate when she made her identification.

On March 29, 2008, at 9:50 a.m., Detective Thomas Gaul interviewed Loretta Epps, who was a nightclub patron when this incident occurred. During the interview, Ms. Epps described two perpetrators: one man was taller than Detective Gaul, who was 6'3", and the other man was even taller and wearing a white baseball cap and red jacket. Ms. Epps was also shown a photographic array and asked if she recognized anyone from the incident. Ms. Epps identified Bruce Lee and stated: "This guy was on the bar second floor. I can't say for sure he was one of the guys who was stomping on the guy though." At trial, Ms. Epps further described the two perpetrators. The man stomping the

victim's head and neck was about 6'2" or 6'3" tall and a fairly thin person who weighed about 190 to 210 pounds. He was wearing a red jacket, white baseball cap, and tan Timberland boots. The second man may have been a little shorter and slimmer than the first man.

Detective Verrechio was the assigned investigator in this homicide case. Based on his investigation, he obtained arrest warrants for [Appellant] and Bruce Lee on April 5, 2008. He also obtained search warrants for [Appellant's] residence at 2639 Oakford Street and Bruce Lee's residence at 2645 Oakford Street in Philadelphia. These properties are three doors apart from each other and approximately nine (9) or ten (10) blocks away from Club 121 at 35th and Wharton Streets. Detectives executed the search warrant at [Appellant's] residence, but nothing of evidentiary value was recovered. [Appellant] was not present in his home when police served the arrest warrant. Detective Verrechio left his contact information and a copy of the search warrant with a female relative. [Appellant] later contacted police and told them that he would surrender on a date certain, but he failed to do so.

On April 5, 2008 Detective Steven Mostovyk executed a search warrant at 1248 South 27th Street in Philadelphia, the address of Bruce Lee's friend Latifa Sharee Allison. This residence is just around the corner from 2639 Oakford Street. During the execution of this search warrant, Detective Mostovyk recovered two pairs of size 13 Timberland boots, one tan and one light brown, and submitted them to the criminalistics laboratory. Later that day, Bruce Lee was arrested at his girlfriend's house in Yeadon, Pennsylvania. At that time, Bruce Lee was 6'5" tall and weighed 260 pounds.

In the early morning hours of April 9, 2008 police officers returned to [Appellant's] residence. Shortly after knocking and announcing their presence, Sergeant Davis heard the door latch turn. When Police Officer Thomas Dydra looked through the living room window, he saw a dark shadow walk up to the door and then back up against the wall. Officer Dydra communicated his observation to Sergeant Davis, and the men waited a few minutes. No one responded. Sergeant Davis then knocked harder and announced louder. When no one responded Sergeant Davis loudly requested a sledgehammer and a halligan bar to assist in opening the door. At that time [Appellant] opened the door and said: "I'm right here." [Appellant] was arrested and

transported to the Homicide Unit. After [Appellant's] arrest Detective John Cahill completed a biographical report of [Appellant] on April 9, 2008. At that time, [Appellant] was 6'2" tall and weighed 215 pounds. He was wearing a white thermal long sleeve shirt, blue denim jeans, and tan Timberland boots size $11^{1/2}$. Detective Cahill confiscated those items from [Appellant] and submitted them to the criminalistics laboratory. In his report, Detective Cahill noted that [Appellant] named Bruce Lee as an associate. After [Appellant] and Bruce Lee were arrested, Detective Singleton obtained two buccal swabs from each man and submitted them to the criminalistics laboratory.

At trial, Gamal Emira testified as a forensic science expert. Mr. Emira analyzed the evidence submitted to the criminalistics laboratory and prepared a report. The dark red stain swab [taken from the pool of blood on the floor of the club] tested positive for blood. Mr. Emira did not see any blood stains on visual examination of the black baseball cap. He observed a rootless human brown hair fragment. He also cut a piece of the sweatband from the cap for identification purposes. He also swabbed the recovered eyeglasses. His visual examination of the tan size $11^{1/2}$ Timberland boots recovered from [Appellant] reaped one microscopic brown stain on the left side of the left boot. He did not find any other stains. Mr. Emira testified that he suspected that it was blood, but he did not conduct blood testing because of the sample's small size. Instead, he swabbed the stain and submitted it for DNA testing. Mr. Emira also observed brown stains during his visual examination of the two pairs of size 13 Timberland boots recovered from Bruce Lee. Mr. Benjamin Levin, a DNA science expert, received and analyzed the swabs Mr. Emira submitted to the DNA laboratory. Mr. Levin concluded to a reasonable degree of scientific certainty that the dark brown stain swab recovered from the banquet room dance floor was from James Anderson. There were no DNA results from [Appellant's] left Timberland boot, the sweatband, the eyeglasses, or Bruce Lee's right Timberland boot.

On February 22, 2012, Bruce Lee entered into a negotiated guilty plea to third-degree murder, at CP-51-CR-0000746-2009. On that same day, Bruce Lee was sentenced to an imprisonment term of seven (7) to fourteen (14) years.

Trial Court Opinion (TCO), 4/30/15, at 2-9.

Based on this evidence, the jury convicted Appellant of third-degree murder. On December 6, 2013, Appellant was sentenced to a term of 20 to 40 years' incarceration. On December 9, 2013, Appellant filed a post-sentence motion (hereinafter, "December 9th motion") asserting several errors by the trial court, and also asking for additional time to file a supplemental post-sentence motion within 30 days of receiving the trial transcripts. On December 10, 2013, Appellant filed a second post-sentence motion, entitled a "Motion for Reconsideration of Sentence," (hereinafter, "December 10th motion") solely challenging the sentence the court had imposed. On January 31, 2014, the court issued an order denying Appellant's December 10th motion. The order did not advise Appellant of the time within which he could file an appeal from that order.

In regard to Appellant's December 9th motion, the certified record reveals that the court never ruled on it, nor did the Philadelphia Clerk of Courts issue an order denying it by operation of law as mandated by Pa.R.Crim.P. 720(B)(3)(c). On June 4, 2014, Appellant filed a supplemental post-sentence motion raising various claims, including a challenge to the discretionary aspects of his sentence. On August 8, 2014, the trial court issued an order denying that motion. In the order, the court directed that Appellant had 30 days within which to file an appeal. On August 28, 2014, Appellant filed a notice of appeal with this Court. He also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, he raises five issues for our review:

1) Where the Commonwealth's evidence failed to sustain its burden as the Commonwealth's witnesses were completely inconsistent with each other in demonstrating Appellant's guilt and, in fact, conflicted with each other[,] and where those witnesses failed to disprove the numerous witnesses that comprised Appellant's alibi defense, was the evidence insufficient as a matter of law[?]

2) Where the evidence presented by the Commonwealth was inherently inconsistent with itself; where only one of three Commonwealth witnesses implicated Appellant in this crime; and where there were several defense witnesses that did not place Appellant at the scene of the crime, did the verdict shock the conscience and require the grant of a new trial? Did the trial [c]ourt abuse its discretion in not granting that new trial?

3) Where the lower [c]ourt admitted highly prejudicial habit evidence, which led to the giving of a consciousness of guilt charge while at the same time not permitting [the] defense … to present evidence of habit, which was a significant and credible portion of the defense evidence demonstrating innocence, did it err in excluding this testimony?

4) Where the lower [c]ourt's sentence was excessive, violated the norms of the Sentencing Code, 42 Pa.C.S. [§] 9721(b), and the sentence did not provide an adequate basis as to why the maximum sentence was imposed, did the lower [c]ourt abuse its discretion in imposing the maximum sentence for the … conviction?

5) Does the attached Affidavit of Bruce Lee, admitting sole responsibility, require a remand to determine whether this newly discovered evidence requires a [new trial]?

Appellant's Brief at 3-4.

Before addressing Appellant's issues, we must first determine if we have jurisdiction over his appeal. On May 22, 2015, this Court issued a *per curiam* order directing Appellant to show cause why his appeal should not be quashed as being untimely filed on August 28, 2014, from the judgment of sentence imposed on December 6, 2013. Appellant filed a response on June

1, 2015, arguing that a breakdown in the operation of the trial court caused his facially untimely notice of appeal. On June 9, 2015, this Court discharged the rule to show cause and deferred the decision on the timeliness of Appellant's appeal to this panel.

After reviewing the certified record, and Appellant's response to the rule to show cause, we agree with Appellant that a breakdown in the operation of the lower court excuses the untimely-filing of his notice of appeal. *See Commonwealth v. Patterson*, 940 A.2d 493, 498 (Pa. Super. 2007) (stating that the general rule that an appellate court may not extend the time for filing an appeal "does not affect the power of the courts to grant relief in the case of fraud or breakdown in the processes of the court") (citing Pa.R.A.P. 105, Explanatory Note). As stated *supra*, the Philadelphia Clerk of Courts failed to issue an order notifying Appellant that his December 9th motion was denied by operation of law. We have previously deemed such an error as a breakdown in the court's operations. *See id.* at 499 ("We have also found a breakdown where the clerk of courts did not enter an order notifying the appellant that his post-sentence motion was denied by operation of law.") (citing *Commonwealth v. Perry*, 820 A.2d 734, 735 (Pa. Super. 2003)). Because no order was issued denying Appellant's December 9th motion (in which Appellant sought, *inter alia*, an extension of time to file an additional motion after obtaining the trial transcripts), Appellant filed a supplemental motion on June 4, 2014, raising the issues he now asserts on appeal. The trial court accepted that post-sentence motion,

which was within its discretion to do. *See* Pa.R.Crim.P. 720(B)(1)(b). When the court issued its August 4, 2014 order denying Appellant's supplemental motion, it stated that Appellant had 30 days within which to file a timely appeal. Appellant's appeal was filed on August 28, 2014. In light of these circumstances, we will excuse the facial untimeliness of Appellant's notice of appeal.

In Appellant's first issue, he argues that the evidence was insufficient to sustain his conviction of third-degree murder. To begin, we note that:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. *Commonwealth v. Moreno*, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. *Commonwealth v. Hartzell*, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. *Moreno, supra* at 136.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011).

Here, Appellant primarily contends that the testimony of the Commonwealth's three eyewitnesses - Harvey Tilghman, Jana Perry, and Loretta Epps - was so "inherently contradictory and unreliable … that it was insufficient as a matter of law to prove [Appellant's] guilt[,] as well as

insufficient to overcome the alibi evidence."[1]  Appellant's Brief at 20. Initially, Appellant and the Commonwealth dispute whether Appellant's argument is a sufficiency-of-the-evidence challenge, or a weight-of-the-evidence claim.  This Court has repeatedly stated that "[a] challenge to the credibility of evidence represents a claim that the verdict was against the weight of the evidence[,]" not the sufficiency.  ***Commonwealth v. Griffin***, 65 A.3d 932, 939 (Pa. Super. 2013) (citing ***Commonwealth v. Palo***, 24 A.3d 1050, 1055 (Pa. Super. 2011)).  Appellant argues, however, that because he is asserting that the evidence was so inherently unreliable that it could not be believed, as a matter of law, he has presented a sufficiency claim under ***Commonwealth v. Karkaria***, 625 A.2d 1167, 1170-71 (Pa. 1993) (characterizing, as a sufficiency challenge, a claim that "the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture").

We need not resolve the dispute regarding how to categorize Appellant's argument, because even accepting it as a sufficiency challenge, we conclude that the testimony of Mr. Tilghman, Ms. Perry, and Ms. Epps was *not* so inconsistent as to be inherently unreliable, as a matter of law. Our review of the record reveals that these three eyewitnesses were present

_____

[1] Appellant's 'alibi evidence' refers to testimony by several defense witnesses that Appellant was on the first floor of the club at the time Mr. Anderson was attacked on the second floor of that establishment.

in a crowded, dimly-lit club when a chaotic situation erupted. *See* N.T. Trial, 7/23/13, at 88-89, 125, 135-37; N.T. Trial, 7/24/13, at 24. Ms. Perry, who stands 4'11" tall, was on a dance floor with 15 to 20 other people when she observed a man stomping on Mr. Anderson's head.[2] *See* N.T. Trial, 7/23/13, at 135-37, 141. She later identified that man as Bruce Lee; however, at trial, she testified that she picked Lee out of a photographic array by using the "eeny meeny miny moe" method. *Id.* at 145-46, 149.

Ms. Epps testified that "[t]here was a lot going on" when the altercation began, and there were "disco lights … flashing" in the darkness. *Id.* at 90, 95-96. She stated that she saw two men stomping on Mr. Anderson, but claimed that only one of the stompers was "connecting" with Mr. Anderson's face and neck. *Id.* at 90. She could not identify either of the men who were stomping because of the dim lighting. *Id.* at 96.

_____

[2] In the trial court's summary of the facts, it suggests that Ms. Perry was standing close to Mr. Tilghman, Mr. Anderson, Mr. Lee, and Appellant when Mr. Anderson was attacked. *See* TCO at 2. However, our review of the record reveals that Ms. Perry testified that after Bruce Lee 'tugged' on her, pulling her half-on and half-off the dance floor, she went back onto the dance floor and continued to dance. *See* N.T. Trial, 7/23/13, at 132. She explained that she was dancing for "about a minute," and was in the midst of a group of people on the dance floor, when she heard a commotion and "a scream." *Id.* at 133-35. She "kind of froze" and then "stepped back to kind of … hide [herself]" while people began to "scatter." *Id.* at 135. Ms. Perry looked towards the commotion and saw Mr. Anderson "falling back" and "a guy stomp[ing] him twice." *Id.* at 136-37. Ms. Perry testified that "[o]nce the guy got finished stomping and … ran down the steps," she went to Mr. Anderson's side and tried to "get him to move…." *Id.* at 137-38.

Mr. Tilghman testified that he was standing in close proximity to Mr. Anderson, but was facing away from him, when he heard a commotion and turned to see Mr. Anderson on the floor. N.T. Trial, 7/24/13, at 19-20, 22-23. He got to Mr. Anderson's side within 10 to 15 seconds. *Id.* at 25. When Mr. Tilghman was kneeling beside Mr. Anderson, someone came "around [Mr. Tilghman's] back" and "stomp[ed] down on [Mr. Anderson's] face ... [a]t least two times." *Id.* at 27, 28. Mr. Tilghman testified that he jumped up, turned around, and saw that the person who had stomped on Mr. Anderson was Appellant. *Id.* at 29. He pushed Appellant, who pushed back, causing Mr. Tilghman to fall over Mr. Anderson. *Id.* at 29-30. Mr. Tilghman asked Appellant, "[w]hat did you do?" Appellant replied, "[h]e disrespected me." *Id.* at 30.

In sum, there was testimony by Ms. Epps that two people were stomping on Mr. Anderson. Mr. Tilghman identified one of those people as Appellant, and Ms. Perry identified another as Bruce Lee. Even though Mr. Tilghman did not identify Mr. Lee as a stomper, and Ms. Perry did not identify Appellant, their testimony indicates that they were viewing the altercation from different perspectives and distances, and the club was dimly lit and crowded. Thus, it is not unreasonable that their statements would differ, and the inconsistencies in their versions of the attack do not render their testimony so 'inherently unreliable' as to make it insufficient 'as a matter of law.' Rather, it was within the province of the jury to pass upon the credibility of these witnesses, and determine what portion(s) of their

versions of the attack to believe or disbelieve. *See Commonwealth v. Troy*, 832 A.2d 1089, 1092 (Pa. Super. 2003) (stating "the trier of fact[,] while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence") (citation omitted).

Moreover, the credibility of the eyewitness testimony identifying Appellant as participating, either as a principal or an accomplice, in the stomping of Mr. Anderson was bolstered by other evidence presented by the Commonwealth. For instance, as the trial court points out, "[w]hen police arrested [Appellant], he was wearing a pair of tan Timberland boots[,]" thus demonstrating that Appellant "had the means to commit the crime." TCO at 15. Appellant also fled "immediately after the incident and later conceal[ed himself] before his arrest[,]" thus providing "further support of his guilt." *Id.* at 16 (citing *Commonwealth v. Paddy*, 800 A.2d 294, 322 (Pa. 2002) (reiterating that "[w]hen a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis [of a conviction] in connection with other proof from which guilt may be inferred")).

We also find unconvincing Appellant's contention that the Commonwealth failed to disprove his alibi defense. While Appellant presented several witnesses who testified that Appellant was on the first floor of the club at the time of the altercation, Mr. Tilghman's testimony contradicted that evidence. Again, it was within the province of the jury to

determine whether to believe Appellant's alibi evidence, or the testimony of Mr. Tilghman.[3]  Consequently, we conclude that Appellant's challenge to the sufficiency of the evidence is meritless.

Next, Appellant attacks the weight of the evidence to support his conviction of third-degree murder.

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence.  It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice.  In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Houser*, 18 A.3d 1128, 1135-1136 (Pa. 2011) (citations and internal quotation marks omitted).

To summarize, Appellant essentially reiterates his argument that Mr. Tilghman's testimony that Appellant stomped on Mr. Anderson's face was inherently unreliable.  Appellant again avers that Mr. Tilghman's account of the incident was called into question by Ms. Perry's testimony that the 'stomper' was Bruce Lee.  He also stresses that Bruce Lee pled guilty to

---

[3] To the extent Appellant suggests that the jury erred by crediting Mr. Tilghman's testimony over that of his alibi witnesses, he is challenging the weight, not the sufficiency, of the evidence.  *See Griffin*, 65 A.3d at 939.

third-degree murder, which Appellant construes as unequivocal proof that Mr. Lee was the person who did the stomping. Appellant's Brief at 30.

Appellant further notes that Ms. Epps' testimony that two people were stomping on Mr. Anderson contradicted the testimony of both Ms. Perry and Mr. Tilghman, and was also called into question by the medical examiner's testimony that there were no injuries to Mr. Anderson's chest or lower body. Appellant also asserts that his alibi defense "remained unrebutted" and, thus, the jury should have afforded it more weight than the evidence presented by the Commonwealth. Appellant's Brief at 34. Interestingly, Appellant concedes that "some of the defense witness[es'] testimony was … inconsistent," but he excuses those inconsistencies as "not unusual" given the fact that five years had passed between the incident and the defense witnesses' testimony at Appellant's second trial. *Id.*

Appellant's arguments do not demonstrate an abuse of discretion by the trial court in rejecting his weight-of-the-evidence claim. Preliminarily, Appellant's excuse for the inconsistencies in the defense witnesses' testimony is just as applicable to the contradictions he alleges in the testimony by the Commonwealth's witnesses. Additionally, Appellant's alibi evidence *was rebutted*, specifically by Mr. Tilghman's testimony that he witnessed Appellant stomp Mr. Anderson's face. Thus, these arguments are unavailing.

Moreover, we discern no abuse of discretion in the trial court's rejection of Appellant's claim that the Commonwealth's witnesses were so

inconsistent as to render the verdict speculative or mere conjecture. *See* TCO at 17, 19. We need not rehash our discussion regarding why the differences in the testimony of Mr. Tilghman, Ms. Perry, and Ms. Epps do not make their statements inherently unreliable, such that the jury could afford them no weight. We need only reiterate that Ms. Epps testified that she saw two men stomping on Mr. Anderson, and Mr. Tilghman and Ms. Perry identified both Appellant and Mr. Lee, respectively, as being involved in the altercation. While Ms. Perry's and Mr. Tilghman's testimony is seemingly at odds regarding which man stomped on Mr. Anderson's face, the jury was free to credit Mr. Tilghman's claim that it was Appellant, especially since the evidence suggested Mr. Tilghman was closer to the fray, while the short-statured Ms. Perry observed the altercation from the crowded dance floor in the dimly-lit club. Additionally, Mr. Lee's guilty plea does not cast doubt on Mr. Tilghman's testimony, as that plea does not, in and of itself, prove that Mr. Lee was the person who stomped on Mr. Anderson's head. Notably, we have no record of what admissions Mr. Lee made during that proceeding.

For all of these reasons, Appellant has failed to demonstrate that the trial court abused its discretion in rejecting his weight-of-the-evidence claim. Thus, Appellant's second issue does not entitle him to relief.

Appellant next asserts that the court erred by precluding him from presenting what he characterizes as 'habit evidence.' We begin by noting:

> The standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit evidence is well settled. Questions concerning the admissibility of evidence

lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. *Commonwealth v. Hunzer,* 868 A.2d 498 (Pa. Super. 2005). Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Id.*

*Commonwealth v. Young*, 989 A.2d 920, 924 (Pa. Super. 2010) (citation omitted).

Appellant's argument involves the court's preclusion of certain prior testimony by defense witness Warren Bond, a security officer at the club where Mr. Anderson was killed. By way of background, Bond testified on Appellant's behalf at both his first and his second trials. Pertinent to Appellant's claim herein, at the second trial, Bond testified that Appellant was on the first floor of the club when Mr. Anderson was attacked, and that Appellant followed Bond upstairs to the second floor after the commotion began. *See* N.T. Trial, 7/25/13, at 18-19. On cross-examination, the Commonwealth impeached Bond with a portion of his testimony at Appellant's first trial, in which Bond stated: "This particular night, I don't know if [Appellant] came up the steps behind me or not. I'm not sure. But I know I was clearing everybody out. He was standing right there. I said, [Appellant], you need to go downstairs[.]" *Id.* at 29.

After the Commonwealth's questioning of Bond, defense counsel sought to admit a larger portion of Bond's testimony at Appellant's first trial. In particular, counsel wanted to introduce Bond's testimony that Appellant

was a 'regular' at the club, and that "9[] times out of 10" Appellant would assist Bond in defusing arguments between patrons of the club. N.T. Trial, 7/25/13, at 42. Defense counsel argued that this testimony by Bond should be admitted to provide context to the testimony the Commonwealth used to impeach Bond. Specifically, defense counsel asserted that the Commonwealth was "allowed to use a portion of [Bond's] answer [at Appellant's first trial] as though that was the only thing he had said in response to the question." *Id.* at 42-43. Ultimately, the court denied the defense's request to introduce more of Bond's testimony, concluding that it was irrelevant to what Appellant did on the night of Mr. Anderson's death, and because it was improper character evidence. *Id.* at 44.

Now, on appeal, Appellant devotes a large portion of his argument to claiming that Bond's prior testimony about Appellant's assisting security constituted admissible 'habit evidence' under Pa.R.E. 406. The Commonwealth, however, contends that Appellant never "argue[d] below that the testimony was admissible as 'habit evidence.'" Commonwealth's Brief at 19. Our review of the record confirms the Commonwealth's claim that Appellant sought admission of this evidence *only* on the basis that it provided context to the portion of Bond's testimony utilized by the Commonwealth to impeach him. Accordingly, Appellant has waived his assertion that Bond's testimony was admissible as 'habit evidence.' *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

- 20 -

However, Appellant incorporates into this third issue another evidentiary challenge, arguing that the court erred by admitting certain testimony by Detective Verrechio. Our review of the record reveals that the Commonwealth re-called Detective Verrechio to the stand to rebut certain testimony by Appellant. Namely, Appellant testified that he called Detective Verrechio and told the detective that he was willing to come to the Homicide Unit to speak to the police, but Detective Verrechio informed Appellant that he did not have to come in at that time. *See* N.T. Trial, 7/25/13, at 62. In rebuttal, Detective Verrechio first testified that he never had a phone conversation with Appellant. Nevertheless, the detective went on to testify, over Appellant's objection, that even if he had spoken to Appellant, he would never have told Appellant not to report to the Homicide Unit when Appellant had an open arrest warrant for murder. *Id.* The detective stated that instead, he would have attempted to convince Appellant to come in, or would have tried to ascertain Appellant's location so police could arrest him. *Id.* Detective Verrechio was then permitted to testify regarding the procedure that he, and other members of the Homicide Unit, follow when an "open warrant for murder" is issued. *Id.* at 63-65.

In its opinion, the trial court concludes that Detective Verrechio's testimony "concerning his routine practice of processing outstanding arrest warrants for a murder suspect … was properly admitted under Pennsylvania Rule of Evidence 406…." TCO at 29. The court explains that under Rule 406, "[e]vidence of a person's habit or an organization's routine practice

may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." TCO at 29 (quoting Pa.R.E. 406). The court further reasons that Detective Verrechio's testimony was relevant and probative, stating:

> At trial, Detective Verrechio provided an informative description of how police followed routine departmental practice when they attempted to locate and apprehend [Appellant], who was a murder suspect in fugitive status. Detective Verrechio's testimony was relevant to showing the course of conduct the police employed after [Appellant] failed to surrender himself as he had initially promised. The introduction of this evidence helped the jury understand the process that police utilized in effectuating [Appellant's] arrest. Moreover, the probative value of this evidence outweighed any potential prejudice to [Appellant]. Accordingly, this court did not err in admitting this evidence.

*Id.* at 29-30.

In Appellant's brief, he primarily argues that it was unfair to admit Detective Verrechio's testimony as 'habit evidence' when the court excluded similar 'habit evidence' by Warren Bond. *See* Appellant's Brief at 44-46. Again, Appellant never argued below that Bond's testimony was admissible habit evidence; thus, he cannot now assert this claim on appeal. Moreover, to the extent that Appellant makes general assertions regarding the admissibility of Detective Verrechio's testimony, he does not cite any legal authority, nor provide any meaningfully developed argument, to support those claims. Consequently, he has failed to demonstrate that the trial court abused its discretion in admitting that evidence.

In Appellant's fourth issue, he challenges the discretionary aspects of his sentence.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. ***Commonwealth v. Sierra***, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
>> We conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).
>
> ***Commonwealth v. Evans***, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. ***Commonwealth v. Mann***, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, 574 Pa. 759, 831 A.2d 599 (2003).
>
> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. ***Commonwealth v. Paul***, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Sierra, supra*** at 912–13.

***Griffin***, 65 A.3d at 935 (quoting ***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010)).

Here, Appellant has satisfied the first two prongs of the test for obtaining review of a discretionary aspect of sentencing claim. Additionally,

despite the Commonwealth's argument to the contrary, Appellant has presented a Rule 2119(f) statement in his brief to this Court. ***See*** Appellant's Brief at 47-49; Commonwealth's Brief at 23 (claiming Appellant failed to include a Rule 2119(f) statement and objecting to its omission). Therein, Appellant contends that his sentence was "excessive and unduly harsh" where (1) it was "nearly three times [the sentence] of Mr. Lee[;]" (2) the court failed to consider mitigating factors; (3) the court based Appellant's sentence solely on the seriousness of the offense and did not take into account, or properly balance, all of the factors that 42 Pa.C.S. § 9721(b) requires the court to consider; and (3) the court failed to state sufficient reasons on the record for imposing "the maximum sentence." ***See*** Appellant's Brief at 47-49.

Appellant has failed to demonstrate that a substantial question exists by arguing that he received a term of incarceration significantly longer than that imposed upon Mr. Lee. Notably, Appellant cites no legal authority to support that such a sentencing claim warrants this Court's review. Additionally, as the Commonwealth points out, "[Mr.] Lee's prior record score, or whether there were mitigating personal circumstances in his case, is unknown on the record of the instant case. Moreover, [Mr.] Lee accepted responsibility and pled guilty." Commonwealth's Brief at 25. We agree with the Commonwealth's points, which Appellant does not counter. Thus, we will not assess the merits of Appellant's argument that his sentence is excessive as compared to Mr. Lee's.

However, we will consider Appellant's other two sentencing claims, as they present substantial questions for our review. *See Commonwealth v. Ventura*, 975 A.2d 1128, 1133 (Pa. Super. 2009) (finding substantial questions where Ventura claimed that the court failed to state adequate reasons for the sentence imposed, and argued that the court focused only on the seriousness of the offenses and failed to consider other relevant factors) (citations omitted); *Commonwealth v. Swope*, 123 A.3d 333, 340 (Pa. Super. 2015) (concluding that Swope's claim that his sentence was "unduly excessive, together with his claim that the court failed to consider rehabilitative needs and mitigating factors upon fashioning its sentence, presents a substantial question"). In examining the merits of Appellant's claims, we bear in mind that

> [w]e review a sentencing court's determination for an abuse of discretion. *Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d 957 (2007). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Id.* When reviewing sentencing matters, this Court must accord the sentencing court great weight as it is in [the] best position to view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime. *Commonwealth v. Hanson*, 856 A.2d 1254, 1260 (Pa. Super. 2004).

*Ventura*, 975 A.2d at 1133–34.

First, Appellant complains that his sentence was excessive in light of mitigating factors, such as his employment history and his status as "a good family man." Appellant's Brief at 53. He also stresses that his sentence

should have been mitigated by the fact that he has a history of drug and alcohol abuse, and that the late-night attack on Mr. Anderson in a bar "was undoubtedly alcohol driven...." *Id.*

Appellant also contends that the court failed to properly weigh the section 9721(b) factors, *i.e.*, the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. 42 Pa.C.S. § 9721(b). In particular, Appellant avers that there was "no evidence that the public needed to be protected" where his criminal history is for non-violent drug crimes, the most serious of which occurred in "the early 1990s...." Appellant's Brief at 54. He also reiterates that he has substance abuse issues, noting that he "admitted to the Mental Health Evaluator that he often drank at least a six-pack of beer a day." *Id.* at 53. Appellant maintains that the court ignored these factors and sentenced him based only on the seriousness of his offense. *Id.* at 55.

Finally, Appellant contends that the court did not state adequate reasons on the record for imposing his sentence. He argues that, instead, the court "merely paid lip-service the factors that it reviewed" and provided a "short hand" explanation for Appellant's sentence that provides "little basis to determine why the [c]ourt imposed the sentence" that it did. *Id.* at 55, 56.

Our review of the record demonstrates that the trial court did not abuse its discretion in fashioning Appellant's sentence. Preliminarily, based

on Appellant's prior record score of 5, and the offense gravity score of 14 for the crime of third-degree murder, the standard guideline range called for a minimum sentence of 16 to 40 years. *See* 204 Pa.Code § 303.16. Thus, Appellant's minimum sentence of 20 years' incarceration is within the standard range. Additionally, the trial court had the benefit of both a presentence report, as well as a mental health evaluation, and explicitly stated that it considered both in fashioning Appellant's sentence. N.T. Sentencing, 12/6/13, at 5, 24. As such, "we are required to presume that the court properly weighed the mitigating factors present in the case." *Commonwealth v. Fowler*, 893 A.2d 758, 766 (Pa. Super. 2006) (citing *Commonwealth v. Boyer*, 856 A.2d 149, 154 (Pa. Super. 2004)).

This Court has also held that "[t]he sentencing judge can satisfy the requirement that reasons for imposing sentence be placed on the record by indicating that he or she has been informed by the pre-sentencing report; thus properly considering and weighing all relevant factors." *Fowler*, 893 A.2d at 767 (citing *Commonwealth v. Burns*, 765 A.2d 1144, 1150-51 (Pa. Super. 2000) (citations omitted); *Commonwealth v. Egan*, 451 Pa.Super. 219, 679 A.2d 237 (1996)). Here, not only did the sentencing court review the presentence report and mental health evaluation, but it also stated that it considered the "factors mandated by both the legislature and appellate Courts." N.T. Sentencing, 12/6/13, at 24. The court reiterated the egregious facts of Appellant's crime, and noted that while Appellant still claimed his innocence, the jury had concluded otherwise. *Id.* at 24-25. The

court stated that it was imposing "a sentence consistent with who [Appellant is], the crime committed, [Appellant's] need for rehabilitation and society's need for protection." *Id.* at 25. After sentencing Appellant in the standard guideline range, the court directed that he "complete drug and alcohol therapy[,]" thus indicating the court's consideration of Appellant's rehabilitative needs. *Id.* In sum, the totality of the court's comments at sentencing demonstrate that the court did not abuse its discretion in fashioning Appellant's standard-range sentence.

In Appellant's fifth and final issue, he contends, for the first time on appeal, that he has obtained after-discovered evidence warranting a new trial or, at the very least, a remand to the trial court for an evidentiary hearing. Specifically, Appellant has allegedly obtained a statement from Bruce Lee (attached to Appellant's brief as "Appendix C") in which Mr. Lee admits that he was the only person who attacked Mr. Anderson. Mr. Lee further states that Appellant was on the first floor of the club during the altercation. *See* Appellant's Brief at Appendix "C." Mr. Lee also claims that he was subpoenaed to testify at Appellant's trial, but he refused to take the stand. *Id.* He asserts that he has now "had a change of heart and would testify" to the facts set forth in his statement. *Id.*

Preliminarily, we note that Appellant has followed the proper procedure for asserting this after-discovered evidence claim, realized during the

- 28 -

pendency of his appeal.[4]  ***See*** Comment to Pa.R.Crim.P. 720 ("[A]fter-discovered evidence discovered during the direct appeal process must be raised promptly during the direct appeal process, and should include a request for a remand to the trial judge…."). Because Appellant is raising this issue for the first time herein, we do not consider it appropriate to evaluate, in the first instance, whether his claim meets the four-pronged after-discovered evidence test.[5]  Instead, we will determine whether he has satisfied the pleading requirements of Rule 720 so as to warrant an evidentiary hearing before the trial court.  In ***Commonwealth v. Castro***,

---

[4] Notably, on August 7, 2015, Appellant filed with this Court an "Application for Remand," requesting that we direct the trial court to conduct an evidentiary hearing to determine if Mr. Lee's affidavit warrants a new trial. This Court issued a *per curiam* order denying Appellant's petition without prejudice to his right to raise the issue in his appellate brief. In his initial "Application for Remand," Appellant attached a hand-written document purportedly drafted by Bruce Lee. In his brief to this Court, the statement is type-written, hand-dated August 16, 2015, and signed by Bruce Lee. However, it is not notorized.

[5] Our Supreme Court has declared:

> To obtain relief based on after-discovered evidence, appellant must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

***Commonwealth v. Montalvo***, 986 A.2d 84, 109 (Pa. 2009) (quoting ***Commonwealth v. Pagan***, 950 A.2d 270, 292 (Pa. 2008)).

93 A.3d 818 (Pa. 2014), our Supreme Court offered guidance on those pleading requirements, cautioning that "[t]he relevant [Rule 720] motion is not to serve as a preemptive means of securing a hearing that will itself comprise the investigation." *Id.* at 828. Rather, such "a motion must, at the very least, describe the evidence that will be presented at the hearing" to meet the after-discovered evidence test. *Id.* at 827, 828.

Here, Appellant claims that Mr. Lee's admission that he was Mr. Anderson's sole attacker meets the prongs of the after-discovered evidence test, stating:

> Given [Mr. Lee's] Affidavit it is clear why Mr. Lee was not called [at Appellant's trial]. He was brought down to [c]ourt [for Appellant's trial] but refused to testify on [Appellant's] behalf. The record also reflects that Mr. Lee was actually brought down by trial [c]ounsel from state prison. [N.T. Trial, 7/25/13,] at 10. However, critically, he would not have testified then for the defense. Hence[,] his evidence was not available for trial.
>
> This is not merely cumulative evidence but was evidence from the person who solely attacked Mr. Anderson and provided the motive for the attack, i.e., that Lee wanted to get Anderson before Anderson got him.[6] Thus, this evidence is also not merely for impeachment purposes.
>
> Finally, this evidence is of such a nature and character that a different verdict will likely result if a new trial is granted. It reflects the fear in Mr. Lee and why he would so viciously attack Mr. Anderson. He felt that his life was threatened. He also

---

[6] Appellant seemingly is referring to Mr. Lee's comment in the affidavit that Mr. Anderson "confront[ed] [Lee] … aggressively" in the club, and told Lee that "he had something for [Lee] when [they] leave the club," which Lee interpreted as a threat. *See* Appellant's Brief, Appendix "C."

admits to knocking Anderson down and then blacking out and kicking him so viciously that Harvey Tilghman tried to intercede.

Thus, [Lee] also puts himself in the altercation with Tilghman and demonstrates that this fight was with him and not [Appellant]. This would have contradicted the critical testimony of Harvey Tilghman about his grappling with [Appellant] before Security arrived. This testimony would also have undercut Tilghman's testimony that [Appellant] kicked Mr. Anderson after Tilghman arrived to help his friend. It would have also undercut Tilghman's testimony that [Appellant] struck Anderson because he had been "disrespected."

Given that this evidence *prima facially* meets all the prongs of the newly discovered evidence test, it is respectfully submitted that this matter be remanded for a hearing on this new evidence.

Appellant's Brief at 59-60.

In arguing that no hearing is warranted, the Commonwealth first asserts that Lee's admission is not 'new' evidence because, "at the time of trial, [Appellant] would have known whether he was with [Mr.] Lee that night and whether he himself stomped on the victim's face." Commonwealth's Brief at 28. We disagree with the Commonwealth's reasoning. Under the Commonwealth's approach, *no* newly-discovered, exculpatory evidence could ever satisfy the above-stated test, because the Commonwealth could simply argue that the defendant always knew of his innocence. Moreover, the new evidence asserted by Appellant is *not* that Mr. Lee committed the crime, but that Mr. Lee is *now willing to admit* that he was Mr. Anderson's sole attacker. In our view, this meets a *prima facie* threshold of 'new evidence.'

- 31 -

The Commonwealth also contends that Appellant has failed to prove that Mr. Lee's statement was 'unavailable' to him at the time of trial, relying on **Commonwealth v. Frey**, 517 A.2d 1265 (Pa. 1986), in support. At the outset, **Frey** is procedurally distinguishable. Frey raised an after-discovered evidence claim in a petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. **Id.** at 1267. The PCRA court assessed that petition and denied it, after which this Court affirmed. **Id.** Our Supreme Court accepted Frey's appeal, and noted that because the PCRA court had denied Frey a new trial, the Court would not reverse that decision "unless there has been a clear abuse of discretion…." **Id.** at 1268. Ultimately, the Supreme Court affirmed.

Here, however, Appellant is raising his after-discovered evidence claim for the first time on direct appeal. The trial court has never ruled on Appellant's issue and, thus, we are not assessing whether the lower court abused its discretion by finding that Appellant did or did not meet the after-discovered evidence test. Rather, we are assessing whether Appellant has met "the *pleading* required for a Rule 720 motion" in order to obtain an evidentiary hearing. **Castro**, 93 A.3d at 826 (emphasis added). Based on the argument by Appellant, set forth *supra*, we conclude that he has met **Castro's** requirement of "describ[ing] the evidence that will be presented at the hearing[,]" and has made a *prima facie* showing that he meets the after-discovered evidence test. Accordingly, it is appropriate for us to remand Appellant's case for the trial court to conduct a hearing and determine, in

the first instance, whether Appellant has *proven*, by a preponderance of the evidence, that the four factors of that test have been met in order for a new trial to be warranted. ***See Commonwealth v. Rivera***, 939 A.2d 355, 359 (Pa. Super. 2007) (finding that where an after-discovered evidence claim was raised for the first time on appeal, "procedure demands that the lower court develop the record" and decide, "in the first instance[,]" whether the defendant is entitled to a new trial based on that after-discovered evidence). If the court determines that no new trial is necessary, the court may re-impose Appellant's sentence.

Judgment of sentence vacated. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/30/2016